F. Frazier Jelke
vs.              ⎱Div. No. 3189.
Eugenia Woodward Jelke⎰

DECISION.

May 31, 1933.

WALSH, J.  Heard on the petition of F. Frazier Jelke for divorce and upon the motion in the nature of a cross petition of Eugenia Woodward Jelke for a divorce.

These parties were married at Alexandria City, Virginia, on the 19th day of December, 1930, the petitioner at that time being fifty years of age and the respondent and cross petitioner being twenty-four years of age.  On October 19, 1932, the petitioner filed his petition for divorce against the respondent and cross petitioner in this Court on the following grounds: "That she hath committed adultery, committed extreme cruelty toward your petitioner, wilfully deserted your petitioner, and hath committed other gross misbehavior and wickedness repugnant to and in violation of the marriage covenant in that she deprived your petitioner of her companionship by going with other men both day and night"; on the third day of November, 1932, the respondent Eugenia Woodward Jelke filed her motion in the nature of a cross petition for divorce in this Court setting forth "that the said F. Frazier

Jelke hath violated the same in this that he hath been guilty of extreme cruelty and hath wilfully deserted said Eugenia Woodward Jelke and hath neglected and refused for the period of at least one year next before the filing of this petition to provide necessaries for the subsistence of Eugenia Woodward Jelke, he being of sufficient ability so to do."  Bills of particulars setting forth details of the charges alleged in both petition and the motion in the nature of a cross petition were filed in due season with the clerk of this Court.

The petitioner F. Frazier Jelke in support of his charge of adultery introduced evidence first of an occasion alleged to have taken place at Birmingham, Alabama, in January, 1931, and second, evidence of the same nature pertaining to 333 East Fifty-third street, New York City, on or about August 2, 1932.  We will take up the Birmingham incident first.  Effie Wagner Bailey, a woman about thirty-five years of age, was put on the stand and testified that for fourteen consecutive days, exclusive of Sundays, in January, 1931, she visited every morning from approximately 9:30 until 12:30, a certain disreputable house said to be conducted by one Ethel Hartman, alias Mrs. J. C. Jones, situated in said Birmingham, and that while she was there she saw the respondent enter said house with a man known as "the Major," and occupy a certain room in which there was a bed for a period ranging from one to one and one-half hours, on two separate occasions; that the condition of the bed at the time of the entry of Mrs. Jelke and "the Major" was neat and made up and that after they left the bed was disarranged and there was other evidence of sexual intercourse having taken place; that Mrs. Bailey's reason for being present in this disreputable house was to spy upon a certain gentleman friend of hers whom she suspected of taking women to this place;

that she herself was divorced in 1925 and was the mother of a seven-year-old boy; that she was not a friend of Ethel Hartman, but that she forced Ethel Hartman to allow her to do this because she knew that Ethel Hartman had been in the practice of selling intoxicating liquor and she had heard that Ethel Hartman had trafficked in narcotic drugs; that she had known Ethel Hartman as an acquaintance in two other apartment houses in Birmingham prior to her visits as above set forth. Upon cross-examination this witness denied that she had ever been arrested for disorderly conduct, and also that she had ever been addicted to the use of narcotics. The respondent produced Ethel Hartman, the proprietress of this disreputable house, who testified that she knew Mrs. Bailey a number of years, and that she had occasionally sold Mrs. Bailey narcotic drugs. She introduced a letter, Respondent's Exhibit DD, from Mrs. Bailey to herself. From this letter it appears that Mrs. Bailey was in close and friendly relations at this time with Ethel Hartman, to such an extent as to divulge to her some private, intimate relations Mrs. Bailey had with another man. We were not impressed with Mrs. Hartman's testimony, and in the face of this serious charge we find great difficulty in arriving at the conclusion that Mrs. Bailey was telling us the truth. It appears that both these women were in receipt of large sums of money from the petitioner's private detectives, and we are inclined to believe that both these women were not averse to making as much money as they could out of the petitioner in return for their testimony. This evidence was procured through a detective agency employed by the petitioner, and Mr. Peterson and Miss Kroemer, representing this detective agency, appeared on the witness stand. In their testimony it appeared to us that they were quite anxious to satisfy the demands of their wealthy client, and while the petitioner was innocent in the matter and had every reason to believe in the truth of the statements he received from both Mrs. Bailey and Mrs. Hartman, I am inclined to believe that the detective agency was quite anxious to procure this evidence in order to get a favorable result if possible. The only corroboration of Mrs. Bailey was attempted through the testimony of a colored maid, whose deposition was read before us. A picture of the colored maid was introduced in evidence, and is marked Respondent's Exhibit CC. Havanah Bolden, the maid, was described as colored, weighing about two hundred and thirty pounds, intellectually dense, and very ignorant. Her appearance is not impressive. Upon cross-examination she failed to describe the apartment satisfactorily to us, despite the fact that she had said that she was employed there about seven months. Mrs. Jelke flatly denied this charge of adultery in Birmingham, Alabama. The burden is upon the petitioner to satisfy us by a fair preponderance of the credible testimony that she committed this act of adultery, and we find that the witnesses introduced in support of this particular charge are not convincing, and that the burden in this particular has not been sustained by the petitioner.

The second act of adultery is alleged to have taken place in the apartment of one Robert White at 333 East Fifty-third street, on the night of August 2 and 3, 1932. White had an apartment in this building, which was an apartment house containing one hundred and sixty-three apartments. John Manning, a taxi driver, supported by Henry Westing, a detective employed by the Petersen Detective Agency, both testified that they saw Mrs. Jelke come out of this apartment house between 9:15 and 9:30 on the morning of August 3, 1932, in the company of Robert

White, cross the street and get into a Ford car registered in White's name; that they followed this Ford car over towards Long Island and lost it in the traffic jam. Mrs. Jelke explains that she was in this apartment house on this morning waiting for White to come downstairs, and that she had stayed the night before at the Savoy Plaza Hotel, and had breakfast at the Savoy Plaza before she went to East Fifty-third Street. She is corroborated by a breakfast check from the records of the Savoy Plaza Hotel, which shows that there was a breakfast served in her room between the hours of eight and ten on August 3, 1932. She is also corroborated by one George W. E. Baldwin, who testified he spent the night of August second and third in Robert White's apartment at 333 East Fifty-third Street, and that there was no woman there; that he slept in the same room with White, and that he is a friend of White's. The burden is upon the petitioner to satisfy us in this instance by a fair preponderance of the credible testimony, and this he has failed to do. The other charge of audultery contained in the bill of particulars was not sustained by any proof, and was stricken from the bill of particulars before the end of the testimony.

The next charge in the petition is that of extreme cruelty, and comprises a large number of items. Before discussing the items specifically, it might be wise to relate the impression that the evidence has made upon us up to this point as to the relations between these parties. There is no doubt from all the evidence that this fifty year old husband was deeply infatuated with his young wife, and we are not convinced that the wife reciprocated his affection. We are inclined to believe that for her it was a marriage of convenience and an opportunity to indulge in luxury rather than an opportunity to become a helpmate to her husband. The wife liked excitement, social affairs and a good time, and no blame is attached to her for that, because at her age such things are expected. The husband was settled in his habits and was less inclined for excitement or active social affairs. Under these conditions, it was to be expected that the husband's refusal to partake to the fullest extent in the wife's pleasures would cause quarrels between them. From all the evidence, we are compelled to conclude that the use of improper language was common to both. From the appearance of the husband on the stand and from his testimony, we are led to believe that during the time that he was infatuated with his wife he did not deny her anything, no matter how expensive. His gifts of jewelry and clothing show that he was lavish in his expenditures, although at the time he made a mental reservation apparently that his wife was very extravagant. When the break took place between them in September, 1931, he apparently realized for the first time that his wife was having a good time and spending a great deal of money, and that she apaprently had not yet reached the time of life when the interest in her husband would cause her to share in his responsibilities and cares. His letters and telegrams to his wife up to September, 1931, show conclusively that he was deeply in love and saw none of her faults.

In September, 1931, the father and mother of the petitioner were seriously ill in Chicago, and he received a communication calling for his immediate presence there at their bedside. He left Newport hurriedly and went to Chicago. Shortly thereafter the wife went to New York with a girl friend and participated in a round of social pleasures lasting three or four days. In the evidence pertaining to

these three or four days there is some testimony as to cocktail drinking by the respondent, but there is no evidence that she was ever drunk or that she drank excessively. He called the respondent by phone a number of times from Chicago and got no response from her apartment, and after failing to hear from her for four days he reached her on the telephone about three o'clock one morning in her apartment, shortly before which time she had arrived at her apartment. The telephone conversation was not friendly and was followed by a telegram from the wife to him stating that she was going to leave him because of his treatment of her friends and because of his stinginess in money matters.

The acts of extreme cruelty set forth in the petitioner's bill of particulars are to the effect that the respondent cursed and struck him and bit him and tore his shirt, of making excessive demands for money upon him, of humiliating and holding him up to ridicule and disparaging his reputation, of nagging, of failing to show sympathy during the illness and deaths of his father and mother, of continually entertaining people disapproved by him, of drinking excessively, of complaining as to lack of sexual satisfaction, insisting that he attend entertainments when he was physically and mentally fatigued, and so forth. We are inclined to believe that the respondent did use profane language towards her husband, and that she did fail to show sympathy for him during the serious illness and deaths of his father and mother, and that she entertained people disapproved by him, and that she complained as to the lack of sexual satisfaction. In these particulars, we find the evidence substantiates the charge of extreme cruelty. The next complaint in the petition is that of desertion, and alleges that the telegram from the

wife to him as of September 15, 1931, from New York City, shows wilful desertion, coupled with the fact that the wife has not returned to his domicile since that time. There is some evidence that the wife made attempts at reconciliation after this date and that the petitioner refused to make such offer because he felt that if he once did she "would have him eating out of her hand thereafter." While the door of the husband's house was open to the wife after September 15, 1931, it seems to us that if the wife presented herself at the door for admission she would receive anything but a warm welcome. Hence, I cannot sustain the charge of wilful desertion as alleged in the petition.

The charges of gross misbehavior as set forth in the bill of particulars include the Birmingham adultery incident above dealt with, which I find not sustained by a fair preponderance of the evidence; that Atlantic Beach Club on or about September 4, 1931, of heavy drinking with men unknown, and which I do not find to be sustained by a fair preponderance of the evidence; 333 East Fifty-third Street, New York City, on or about August 3, 1932, with a man named Robert White from 12:30 A. M. to 9:30 A. M., which I do not find to be sustained by a fair preponderance of the evidence; 12 East Seventy-seventh Street, New York City, October 13, 1932, in a speakeasy, heavy drinking with one Lawrence Gray and Robert White, upon which I do not find the proof satisfies us; the Mayfair Ball, New York City, October 16, 1932, with a man unknown, upon which no proof was introduced before us; 885 Park Avenue, New York City, on or about October 23, 1932, heavy drinking entire night with a man named Richard and a man named Bragiotti, about which no proof was introduced before us; 15 East Sixty-first Street, New

York City, October 24, 1932, at a speakeasy drinking with a man named Crossman, which I find has not been sustained by a fair preponderance of the evidence. In this connection, however, we do think that the activities of the respondent with Robert White were most indiscreet, and while there was no evidence tending to show any improper relations betwen these parties, we believe that constant association was not such conduct as a faithful wife should use in her relations with her husband.

Upon a resume of all the testimony introduced by the petitioner, therefore, we conclude that he has shown extreme cruelty to our satisfaction.

We will now take up the motion in the nature of a cross petition filed by the wife. The wife charges various acts of extreme cruelty in isolated instances up to March 19 or 20, 1931. On that day she states that her husband struck her and knocked her down twice, causing a bruise in the region of her right temple or right eye which persisted for several days. The husband denies this specific charge, but Mrs. Jelke is corroborated by Mr. Robert H. R. Hitt, a former member of the Diplomatic Service of the United States, who testified that he saw Mrs. Jelke at his home in Washington within a day or two of this alleged occurrence and that she had a contused. very blue black eye, which was perfectly obvious. In view of Mr. Hitt's disinterestedness, we feel that this is sufficient corroboration of Mrs. Jelke that she did receive this black eye on March 19 or 20, 1931, at the hands of her husband. In June, 1931, in London, Mrs. Jelke complained that she was knocked down by her husband and a large lump formed on the right side of her head, and that while she was lying down her husband attempted to kick her in the mouth. Miss La Coste, whose deposition was read, corrobor-

ates Mrs. Jelke in this regard. The third act of extreme cruelty alleged by Mrs. Jelke was at the home of Mr. Jelke's parents in Chicago September 17, 1931. We feel that in this instance both husband and wife were equally guilty. Mrs. Jelke also introduced testimony tending to show that her husband at divers times used disgusting, lewd and abusive language to her in the presence of others. The chauffeur who drove the Jelkes in Paris testified as to these occurrences.

All these acts as set forth in the testimony tended to have an effect upon Mrs. Jelke's general health, and Dr. Sidney R. Miller of Johns Hopkins Hospital testified that he treated Mrs. Jelke from October 6, 1931, to December 5, 1931, at the Union Memorial Hospital in Baltimore, and that her condition was undoubtedly due to the treatment she received at the hands of her husband. Dr. Miller also testified that there was no indication of chronic alcoholism in his patient at any time. Grouping all the evidence as to these assaults and abusive language together, we are forced to the conclusion that there were times when Mr. Jelke lost his temper, and that at those times he did use vile and abusive language to his wife, and on occasions used physical violence towards her. He had married a nervous, emotional woman according to Dr. Miller, and such conduct towards her resulted in her becoming run down, under weight, and to suffer from insomnia. In this respect, it has been shown to our satisfaction by a fair preponderance of the credible testimony that Mr. Jelke was guilty of extreme cruelty towards his wife during this period.

In order to prevail in an action of this kind, it is necessary that the party moving the Court for relief should show by a fair preponderance of the credible testimony that he or she, as the case may be, has been guilty

of no conduct on his or her part contrary to or in violation of the provision of the marriage covenant. In this case, as it appears that each of the parties hereto has been guilty of extreme cruelty toward the other, we cannot grant either of them relief. The original petition for divorce is denied and dismissed. The motion in the nature of a cross petition for divorce is denied and dismissed.

For petitioner: Charles P. Sisson, William A. Peckham & Clark Burdick.

For respondent: George Paul Slade & Harry Parsons Cross, of Greenough, Lyman & Cross, Morgan J. O'Brien.